**James E. PARDUE and Janiece V. Pardue, Appellants–Plaintiffs,**

v.

**PERDUE FARMS INCORPORATED, Appellee–Defendant.**

No. 28A01–0909–CV–465.

Court of Appeals of Indiana.

April 21, 2010.

David S. McCrea, McCrea & McCrea, Bloomington, IN, Attorney for Appellants.

Lonnie D. Johnson, Kendra G. Gjerdingen, Patrick B. Omilian, Mallor Clendening Grodner & Bohrer LLP, Bloomington, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

James E. Pardue and Janiece V. Pardue ("the Pardues") appeal the trial court's judgment in favor of Perdue Farms Incorporated ("Perdue Farms") on the Pardues' nuisance claims. We affirm.

On May 9, 2002, the Pardues filed a nuisance complaint against Perdue Farms, alleging that they had "been devastated by the sickness and death of horses caused by groundwater contamination from unlawfully stockpiled manure from a Perdue Turkey Farm." Appellants' App. at 20. A three-day bench trial concluded on January 22, 2009. On June 30, 2009, the trial court issued its findings of fact, conclusions, and judgment, which reads in pertinent part as follows:

## I.

### FINDINGS OF FACT

1) [The Pardues] are husband and wife [and] have been married since 1987.

2) The Pardues operate a commercial horse breeding operation in Greene County, Indiana (the "Horse Farm").

3) The Pardues operate their Horse Farm on approximately 450 acres of land divided between multiple parcels of land, some of which they own and some of which they rent.

4) The Pardues began their Horse Farm with the purchase of a farm in 1987. In 1992 the Pardues began renting neighboring acreage from Robert Watson for use in their horse operation.

5) [Perdue Farms] operates a turkey production operation in Indiana.

6) Perdue Farms contracts with 180 independent growers throughout Indiana for the purpose of raising its turkeys from when the turkeys are one day old to a marketable age and weight.

7) Perdue Farms enters into written contracts with the independent growers. Such written contracts are referred to by Perdue Farms as "Growing Agreements."

8) The growers own the land and structures thereon where they raise the turkeys by agreement with Perdue Farms.

9) In 1988, on land adjacent to the Horse Farm, Shenandoah Partners ("Shenandoah") constructed facilities for a turkey growing operation. The turkey growing facilities consist primarily of three rectangular buildings for the purpose of housing turkeys, situated on approximately five

total acres of land (the "Turkey Farm").

10) The turkeys inside the turkey grow-out buildings defecate onto litter which consists of rice hulls and wood chips. New litter is regularly added in layers to the existing litter in the buildings.

11) The three turkey grow-out buildings on the Turkey Farm are designed to hold more than two (2) years['] worth of turkey manure and litter.

12) The manure/litter mixture is occasionally removed from the buildings and stored on site before being hauled away.

13) The Turkey Farm operates on a parcel of land adjacent to, and directly north of a parcel of land owned by Roberta [sic] Watson and which is rented from Watson by the Pardues for use as a portion of their Horse Farm (the "Watson Pasture"). The Turkey Farm is uphill from the Watson Pasture.

14) After constructing the turkey growing facilities, Shenandoah entered into Growing Agreements with Perdue Farms and began raising turkeys on the Turkey Farm.

15) In 1999, Shenandoah sold the Turkey Farm to Randy Sparks ("Sparks"). Sparks has continued to own the Turkey Farm through January, 2009.

16) After purchasing the Turkey Farm, Sparks continued to operate the farm under Growing Agreements with Perdue Farms. Under such Growing Agreements, Sparks raised turkeys owned by Perdue Farms.

17) At no time during the relevant time period, 1992 through the present, has Perdue Farms owned the real estate on which the Turkey Farm operates.

18) From 2000 through 2002, Sparks leased the Turkey Farm to George Anthony ("Anthony"). Anthony operated the Turkey Farm under Growing Agreements with Perdue Farms.

19) On November 7, 2001, the Indiana Department of Environmental Management ("IDEM") issued a Notice of Violation to Anthony citing Anthony for improper handling and storage of turkey manure at the Turkey Farm.

20) Prior to November 7, 2001, Perdue Farms was not aware that turkey manure was entering the Creek [which runs through both the Turkey Farm and the Watson Pasture] from the Turkey Farm.

21) In approximately 2003, after IDEM began regularly inspecting the ongoing operations at the Turkey Farm, a dry stack storage facility was constructed on the site of the Turkey Farm for the purpose of temporarily storing, under a protective roof, turkey manure/litter removed from the turkey barns before the manure/litter could be hauled away.

. . . .

23) The turkey manure generated at the Turkey Farm is a valuable resource which the operators of the Turkey Farm sell to local farmers and other landowners to be used as land-applied fertilizer.

. . . .

25) Turkey manure can be stored onsite without creating harmful run-off if the operators take proper precautions, such as covering manure stacks with a tarp and installing earthen berms around the manure stacks.

26) The Pardues complain of numerous problems with their horses which they attribute to contamination of the Creek from turkey manure generated at the Turkey Farm. Such problems include foals born large, foals dying within days following birth, adult mares dying, mares failing to give birth after apparently having been pregnant.

27) The only horses that consume water from the Creek at the Horse Farm are those horses which are pastured on the Watson Pasture.

28) The Pardues fenced off the horses' access to the Creek in October 2002 and thereafter supplied the horses with an alternative source of drinking water.

29) The area of land that was fenced off from the horses in October 2002 included approximately sixty (60) acres of heavy woods in addition to the Creek.

30) The Pardues' birthing records indicate that they continued to suffer foal losses after the Creek was fenced off in October 2002, continuing through 2007.

31) The Pardues never called or otherwise notified Perdue Farms about the alleged problems the Pardues were having with their horses, rather, the Pardues directed their communications to the operators of the Turkey Farms—Sparks and Anthony.

32) Commercial horse breeding operations regularly experience less than 100% breeding success on an annual basis.

33) The Pardues began having concerns with horse losses on the Watson Pasture in 1993.

34) The Pardues did not inspect the Creek which was the sole source of drinking water for the horses on the Watson parcel until 2001 when the Pardues first suspected their horse losses were associated with the Turkey Farm.

35) In March 2002, the Pardues took one ailing horse named "Moon" to Purdue University for examination. Moon died while in the care of Purdue University. The Purdue doctors who examined Moon opined that possible causes of Moon's health problems and other health problems reported by the Pardues included fescue toxicosis and intestinal parasites known as strongyles. The Purdue doctors did not offer an opinion as to the specific cause of Moon's health problems or death.

36) Anthony Havics, an industrial hygienist testifying on behalf of the Pardues, testified that injuries based on chronic exposure to environmental contaminants are based on a dose-response relationship.

37) Havics testified that the minimum concentration of nitrate in water necessary to cause any harm to horses is 500 parts per million (ppm). Havics did not offer testimony with respect to the concentration necessary to cause the specific harms alleged by Plaintiffs.

38) The Pardues did not produce reliable evidence that at any time the concentration of nitrate in the Creek exceeded 10 ppm.

39) The Pardues did not produce any evidence of any background concentration of nitrate in the Creek at any time.

40) The Pardues did not produce any evidence that the Creek contained any amount of pathogens which would be harmful to horses.

41) The Pardues failed to produce any evidence that would establish any dose or exposure over time of the horses on the Watson Pasture to any nitrate or other contaminants in the Creek.

42) The Pardues have not tested their feeds or water supply for nitrate concentrations or the presence of other harmful contaminants.

43) The Pardues have not tested any of their horses for nitrate poisoning as recommended to them by John Royal, DVM, in 2003.

44) Charles Issel, DVM, offered a number of potential causes for the Pardues' horses' injuries and deaths which could not be ruled out, including fescue toxicosis, improper nutrition and farm management, infectious diseases, parasites, and mare reproductive loss syndrome.

45) The Pardues failed to inspect the Creek which was the sole source of drinking water for their horses on the Watson Pasture between the time they began pasturing their horses on the Watson Pasture in 1992 until the Fall of 2001.

## II.

### CONCLUSIONS

1) The law is with Defendant and against Plaintiffs.

. . . .

6) Under their respective Growing Agreements with Perdue Farms, the operators of the Turkey Farm, that is Sparks and Anthony, were and are independent contractors of Perdue Farms.

. . . .

8) Indiana recognizes a long-standing rule that a principal is not liable for the tortious acts of an independent contractor. Five exceptions to the general rule are recognized by Indiana courts. The five exceptions are: 1) where the contract requires the performance of intrinsically dangerous work; 2) where the principal is charged by law or contract with performing the specific duty; 3) where the act will create a nuisance; 4) where the act to be performed will probably cause injury unless due precaution is taken; and 5) where the act to be performed is illegal.

9) In order to prevail on their nuisance claim against Perdue Farms, the Pardues must prove that the Growing Agreements under which Sparks and Anthony operated the Turkey Farm necessarily required them to create a nuisance.

10) A nuisance is defined under Indiana law as, "Whatever is: (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as [essentially] to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action." I.C. 32–30–6–6.

11) The operators of the Turkey Farm are capable of operating the Turkey Farm without creating a nuisance.

12) Operation of the Turkey Farm in accordance with Perdue Farms' [sic] does not necessarily create a nuisance.

13) Perdue Farms has never participated in the creation of a nuisance at the Turkey Farm.

. . . .

20) Perdue Farms is not liable for any nuisance caused by operation of the Turkey Farm, as alleged by the Pardues.

. . . .

25) An essential element in of [sic] Plaintiffs' claim for injuries to their horses, is that the alleged nuisance proximately caused the injuries.

26) The injuries and deaths to their horses claimed by Plaintiffs are alleged to have been caused by a toxic level of contaminants contained in water consumed by the horses which was allegedly contaminated by turkey manure generated at the Turkey Farm.

27) Where, as here, the cause of an injury or ailment is neither objective in nature nor within the understanding of the lay person, but rather is a complicated medical question, expert medical testimony is required to connect the cause to the injury.

. . . .

31) Plaintiffs produced testimony of three experts at trial—Anthony Havics, Dr. John Royal, and Dr. Charles Issel.

32) Plaintiffs' expert, Anthony Havics, was not qualified to render opinions on proximate causation, nor did Mr. Havics render an opinion as to what actually caused the alleged injuries and deaths to Plaintiffs' horses.

33) Neither Dr. Royal, nor Dr. Issel, who are both experts in veterinary medicine, testified that a contaminant in the Creek caused the deaths or injuries to Plaintiffs' horses.

34) Plaintiffs did not produce any expert at trial who was able to opine or conclude that any specific substance caused the alleged injuries and deaths to Plaintiffs' horses.

35) No expert offered testimony as to the specific cause of any injury or death to any specific horse.

36) Plaintiffs did not produce any evidence at trial of any specific dose or duration of exposure by the horses or any individual horse, to any contaminant in the water from the Creek.

37) Plaintiffs' expert evidence did not include a sufficient differential diagnosis to rule out all possible alternative causes of the alleged injuries and deaths to Plaintiffs' horses.

38) Plaintiffs did not produce any expert at trial who was able to opine or conclude that any component in the turkey manure generated at the Turkey Farm caused the alleged injuries and deaths to Plaintiffs' horses.

39) Plaintiffs' efforts to establish proximate causation are largely based on temporal coincidence which is insufficient to prove causation of toxic exposure injuries.

40) Plaintiffs' evidence does not support a conclusion that their horses' health significantly improved after the horses were restricted from drinking from the allegedly contaminated Creek.

41) The evidence presented at trial is insufficient to determine the specific cause of any injury or death of any of Plaintiffs' mares or foals.

42) Plaintiffs have not presented sufficient evidence to conclude that turkey manure, or any component thereof, generated at the Turkey Farm, caused or contributed to any alleged injuries or deaths to Plaintiffs' horses.

43) Plaintiffs have not proven, to the requisite degree of medical certainty, what causative agent caused the alleged injuries or deaths to any of their horses.

44) Plaintiffs have not proven, to the requisite degree of medical certainty, that any component of the turkey manure generated at the Turkey Farm caused the alleged injuries and deaths to any of their horses.

45) Plaintiffs['] evidence is insufficient to establish that the alleged injuries and deaths to the horses were caused by anything outside of routine or typical injuries and mortality in commercial horse breeding operations in this geographic area.

46) Plaintiffs are not entitled to recover damages for injuries or deaths to their horses because Plaintiffs' evidence presented at trial is insufficient to establish the necessary element of proximate causation with respect to the alleged injuries or deaths to any of their horses.

47) Plaintiffs are not entitled to any damages from Perdue Farms.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Court finds for the Defendant and against the Plaintiffs.

*Id.* at 11–19 (some citations omitted). The Pardues filed a motion to correct error, which the trial court denied, and this appeal ensued.

Indiana Trial Rule 52(A) provides that on appeal of claims tried to the bench, "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." We apply a two-tiered standard of review: we determine whether the evidence supports the findings and whether the findings support the judgment. *Oil Supply Co. v. Hires Parts Serv., Inc.,* 726 N.E.2d 246, 248 (Ind.

2000). "In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment." *Id.* (citation and quotation marks omitted). "We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers thus labor under a heavy burden, but one which may be overcome by showing that the trial court's findings are clearly erroneous." *Id.* (citation omitted).

> We define the clearly erroneous standard based upon whether the party is appealing a negative judgment or an adverse judgment. Where, as here, the party who had the burden of proof at trial appeals, he appeals from a negative judgment and will prevail only if he establishes that the judgment is contrary to law. A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead to only one conclusion, but the trial court reached a different conclusion.

*Fowler v. Perry,* 830 N.E.2d 97, 102 (Ind. Ct.App.2005) (citations omitted).

In their original appellants' brief, the Pardues raise the following two issues: (1) whether the trial court's judgment is contrary to law because "the evidence and all reasonable inferences therefrom lead only to the conclusion that [Perdue Farms], based on nuisance, is liable to [the Pardues] for inconvenience, annoyance and discomfort, because [Perdue Farms] caused a reasonably justified fear for the safety of their property and the trial court has reached a different conclusion";[1] and (2) whether the trial court's judgment is contrary to law because "the evidence and

---

1. *See Gray v. Westinghouse Elec. Corp.,* 624 N.E.2d 49, 54 (Ind.Ct.App.1993) ("[A] plaintiff's fear for his safety or that of his property is sufficient to constitute a nuisance if the evidence shows that fear was reasonably justified."), *trans. denied* (1994).

all reasonable inferences therefrom lead only to the conclusion that [Perdue Farms], based on nuisance, is liable to [the Pardues] for the morbidity and mortality of their three yearlings, and the trial court has reached a different conclusion." Appellants' Br. at 1. In their reply brief, however, the Pardues withdraw the second issue from our consideration and assert, "It is axiomatic that there is a difference between proof required to show that the harmful run-off caused the morbidity and mortality and proof that the Pardues' fear for the safety of their horses was reasonably justified." Appellants' Reply Br. at 12.

Although the Pardues may well have feared that manure from the Turkey Farm was harming their horses, their failure to prove that the presence of the manure on the Turkey Farm and the deaths of their horses was anything more than a temporal coincidence is fatal to their claim that their fear was reasonably justified. To be reasonably justified, a plaintiff's fear must be based on more than speculation. *See Hays v. Hartfield L–P Gas,* 159 Ind.App. 297, 302, 306 N.E.2d 373, 376 (1974) (holding that "mere fear or apprehension of danger caused by the presence of fuel storage tanks, without more, is not a sufficient basis to establish a nuisance."). At the very least, the Pardues have failed to establish that the evidence is uncontroverted in their favor on this issue. Based on the foregoing, we affirm the trial court's judgment in favor of Perdue Farms.[2]

Affirmed.

RILEY, J., and VAIDIK, J., concur.

---

**2.** As such, we need not address the separate issue of whether Perdue Farms can be held liable in nuisance for the acts of its independent contractors, who actually owned and operated the Turkey Farm.